IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JERRY SIMS, JR., | CASE NO. 1:22-cv-2122 |
| Petitioner, | DISTRICT JUDGE PAMELA A. BARKER |
| vs. | |
| WARDEN CHARMAINE BRACY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Respondent. | **REPORT & RECOMMENDATION** |

Pro se Petitioner Jerry Sims, Jr. filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Doc. 1. Sims is in custody at the Ohio State Penitentiary due to a journal entry of sentence in the case *State v. Sims,* Cuyahoga County Court of Common Pleas, Case No. CR-17-623047-A. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Petition be denied.

**Summary of facts**

In habeas corpus proceedings brought by a person under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012).

The Ohio Court of Appeals for the Eighth Appellate District summarized the facts underlying Sims's conviction as follows:

> {¶1} Around midnight on October 21, 2017, East Cleveland police and firefighters responded to a call for a van engulfed in flames. They arrived at the scene to find the remains of a burned body inside the vehicle. Through its investigation, the police identified defendant-appellant Jerry Sims, Jr. ("appellant") as the suspect in the killing of Jamarr Forkland ("victim"). At the jury trial, appellant's girlfriend, Erica Campbell, testified that appellant shot the victim and later, with a friend's help, set the victim's vehicle on fire. Her testimony was corroborated by the cellphone data and a surveillance video. Appellant maintained his innocence; an inmate from the prison testified for the defense, taking responsibility for the murder.

> \*\*\*

> **Testimony by the State's Witnesses**

> {¶3} At trial, the state presented the testimony of 16 witnesses, including appellant's girlfriend, who was with appellant in the evening of the murder, several individuals present at the used car lot prior to the murder incident, the police officers investigating the case, a forensic scientist, the deputy medical examiner, a firearms examiner, and a cell phone tower data analyst. They testified to the events in the evening of the murder and the police investigation leading to appellant's arrest for the murder.

> **a. Michael Smith, Booker Edwards, and Shawndell Lilly**

> {¶4} Michael Smith, Booker Edwards, and Shawndell Lilly, who were acquaintances of the victim, testified to the events the evening of October 21, 2017, preceding the murder of the victim. They were among a group of men congregating and

drinking at the used car lot before appellant showed up at the car lot and started a fight with the victim.

{¶5} Michael Smith, a close friend of the victim, testified that the victim operated the used car lot. A group of friends gathered there that evening to celebrate Shawndell Lilly's birthday. Later in the evening, appellant pulled into the car lot in a car driven by a woman. After getting out of the vehicle, appellant walked toward where Smith and the victim were standing. Without any greeting words, he said to the victim in an aggressive tone, "you know I owe you, right?" The victim did not respond. Appellant repeated it a second time, then grabbed a bottle of wine and broke the bottle over the victim's head. Smith caught a glimpse of a black gun on appellant's hip. Appellant and the victim began to wrestle with each other. Smith quickly left. The next day, he found out the victim had been killed. He went to the police and provided them with information about what he saw at the car lot.

{¶ 6} Booker Edwards, who was the victim's partner in operating the used car lot, was at the car lot for a while but left early in the evening before appellant arrived. When he returned to the car lot the next morning, unaware of the victim's death, he saw glass on the ground.

{¶7} It was Shawndell Lilly's birthday the group of men gathered to celebrate. Lilly testified appellant and his girlfriend Erica Campbell came to the gathering in a vehicle. Soon after, he heard a bottle break and appellant and the victim were fighting. Lilly and others tried to break up the fight, asking appellant why he was angry at the victim. Appellant said that he would tell them later.

{¶8} Lilly's testimony alluded to a possible motivation for the murder. He testified that he knew appellant as a family friend because Lilly's cousin Jwan Boyd—whom appellant treated as an uncle, as others testified—has children with appellant's aunt; Boyd was present at the lot that night but did not

testify. When asked about the relationship between appellant and Boyd, Lilly testified that the two were falling out "because Jamarr [the victim] didn't want him [referring to Sims] at the shop no more." Lilly thought that was why appellant "got so mad" because the victim "didn't want him up there no more." Regarding appellant and the victim's relationship, he stated that "[t]hey [were] cool some days, but, like I said, towards the last week or two, they had been getting into it."

{¶9} During the scuffle, Lilly saw appellant pull his gun out, but Boyd told him to put down the gun. Lilly left when appellant and the victim were still fighting. When Lilly left, the only people remaining at the car lot were Boyd, the victim, appellant, and appellant's girlfriend Erica Campbell.

{¶10} Under cross-examination, Lilly stated that appellant was not acting "fishy" when he saw him the next day. Lilly also acknowledged that he had told the detectives that many of the victim's customers were upset with the victim because he sold them cars that were "lemons."

### b. Erica Campbell

{¶11} Erica Campbell, a social worker, started dating appellant in May 2017. At the time both were involved in another relationship, so they would spend time at the car lot to avoid being seen together by others. They were at the lot almost daily. On the day of the incident, she met appellant after work at the house of Brandon Montgomery, a friend of appellant. After several hours at the house drinking and socializing, she and appellant got into an argument and they left. She was taking appellant home in her vehicle when appellant received a phone call from "Unc"—referring to Boyd—and "Unc" told appellant he needed him to come to the lot. Appellant asked her to drive him there.

{¶12} After they arrived, appellant exited the vehicle. He first urinated on the building on the lot

4

and then walked over to the crowd of people congregating at the lot. She was about to leave when she heard some commotion and saw in her rearview mirror appellant and the victim fighting. Appellant placed the victim in a headlock and was punching him. Boyd tried to break up the fight. She exited her vehicle and yelled at appellant to stop. She then drove her vehicle toward where the fighting was taking place. The fight was eventually broken up, and others started to leave the car lot.

{¶13} Eventually, the only people remaining were appellant, Campbell, the victim, and Boyd. Boyd came to Campbell's car and asked if she and appellant had been drinking. Appellant saw the two talking and yelled at Boyd "don't talk to that bitch." Campbell wanted to leave, but Boyd asked her not to leave without appellant. Campbell drove her vehicle off the car lot and waited in a street in front of the lot. After she left the lot, Boyd left too. The victim was also leaving in his vehicle, a blue van. However, appellant, still inside the lot, closed the gate. Campbell thought they were going to start fighting again. She saw appellant walking toward the van and soon heard gunshots. Based on what she saw, she concluded "Jerry shot Jamarr." Appellant then ran toward her vehicle and got in. He was holding a gun in his hand, which she had seen him carrying in the past.

{¶14} Appellant appeared shocked, saying "me and Unc [are] going to fall out about this." He was shaking his head and screaming "f***, f***, f***," as if he could not believe what he had done. She started to drive away from the car lot, but appellant had her return to it. Appellant got out of her vehicle to switch off the lights of the victim's van and closed the gate of the lot. Once he returned to her vehicle, he called Brandon Montgomery, saying to him repeatedly "I need you." Appellant then directed Campbell to drive to Montgomery's residence, located in the west side of Cleveland. When they arrived, Montgomery was standing in his driveway waiting for them. Appellant exited Campbell's vehicle to talk to him,

5

and then both of them entered her vehicle. They told her to pull into a gas station nearby. Once there, appellant told her to go inside the store to purchase a gas can and two pairs of gloves, and to fill the gas can with gasoline.

{¶15} Campbell then drove them back to the car lot. She was told to park her vehicle next to "Rally's" across from the car lot. Appellant exited the vehicle and told Montgomery to stay with her. Appellant went inside the lot while Montgomery switched to the driver's seat in Campbell's vehicle. Montgomery then received a phone call from appellant. After the call, Montgomery drove the vehicle inside the lot and then handed the gas can to appellant. They both walked toward the victim's van. Minutes later, Montgomery returned to Campbell's vehicle and appellant was driving the victim's van. Montgomery directed Campbell to follow the van.

{¶16} They drove through some side streets before arriving at Wadena Street. Both appellant and Montgomery exited their vehicles. While she sat at her vehicle, she saw appellant pouring gas on the van. She then heard a loud boom and saw the van on fire. Both appellant and Montgomery ran toward her vehicle and got inside. They instructed her to return to the car lot. Appellant and Montgomery entered the car lot and later emerged carrying some plastic bags. Campbell testified that she did not attempt to contact anyone for help during the entire evening because she did not want to do anything to cause appellant to harm her.

{¶17} Campbell then drove her vehicle to Montgomery's residence to drop him off. Appellant insisted that she stay with him that night, so Campbell stopped at her own house to pick up some items she needed. They then drove to appellant's mother's house and stayed there for the night. She said to him, "I never thought you'd put me in a situation like this," to which appellant responded "if I go down, we all going down."

6

{¶18} The next morning, Campbell left appellant when she woke up. Later in the day, she checked Instagram and saw people posting about the victim's death. Initially, she did not want to go to the police because she was afraid to put her family in danger.

{¶19} When she learned the police were looking for her for information relating to the incident, appellant, his sister, and Montgomery tried to coach her on what to tell the police. They told her to tell the police that appellant and the victim got into a fight, but she and appellant left and stayed at appellant's mother's house for the night. In the presence of these individuals, Campbell called the police department to arrange for an interview. In that interview, she told the police that appellant and the victim got into a fight, but she and appellant left to go to a liquor store, and then went to appellant's mother's house and stayed there for the night. During the interview, however, she had an inkling that the police knew more about the murder than she had expected. After the interview, she was arrested and put in jail.

{¶20} While in jail, Campbell met with an attorney provided by her parents, as well as her parents. The attorney told her she was being charged with obstruction of justice. She then did a second interview with the police and provided a statement implicating appellant in the victim's death. Subsequently, after learning appellant was incarcerated, she did a third, final interview with the police, where she told the detectives about Montgomery's involvement. The prosecutor's office later helped her move her family to a different location.

### c. The Investigating Officers

{¶21} Officer Travis Kesecker of East Cleveland police department was one of the officers responding to the call of a car engulfed in flames on Wadena Street. After the fire was extinguished, he inspected the area around the burnt vehicle. He noticed the

vehicle to be missing the gas cap and found the gas cap on the ground on the vehicle's rear passenger side.

{¶22} Daniel Mabel, a forensic scientist at the Cuyahoga County Medical Examiner's Office, was unable to perform firearm or gunshot analysis on the body due to the body's condition. He did discover a charred 9 mm Luger cartridge casing in the engine compartment of the vehicle.

{¶23} Dr. Erica Armstrong, a deputy medical examiner of the Cuyahoga County Medical Examiner's Office, performed the autopsy. The autopsy showed ten gunshots wounds throughout the body and eight bullets were collected. There was alcohol, PCP, and marijuana in the victim's system. A surgical plate with identification numbers in the body enabled her to discover the identity of the charred body.

{¶24} James Kooser, a firearms and tool marks examiner from the Cuyahoga County Regional Forensic Science Laboratory, was able to identify six of the eight autopsy bullets as having been fired from the same 9 mm caliber pistol. The other two bullets were too damaged to be analyzed. The weapon that had fired the bullets was never found.

{¶25} Kooser compared the spent cartridge casing found in the engine compartment of the burnt vehicle to nine spent cartridge casings the police had recovered from a different crime scene in Cleveland, and he was able to determine that they were all fired from the same 9 mm caliber pistol.

{¶26} Sergeant Reginald Holcomb of East Cleveland police department was one of the police officers who apprehended appellant and Montgomery at appellant's sister's apartment. During the patdown of appellant, some gun magazines were found in his pockets.

8

{¶27} Detective Kenneth Lundy was also involved in the investigation of the homicide. He interviewed Jwan Boyd, Shawndell Lilly, Michael Smith, and Campbell. He also interviewed appellant, together with Sergeant Holcomb and Detective Harvey. Appellant stated a fight broke out between him and the victim at the car lot, and he struck the victim with a wine bottle. He left in Campbell's vehicle, however, and they went to a liquor store before going to his mother's house to stay the night there. Later in the interview, appellant admitted he returned to the car lot because he lost his keys. He denied being involved in the victim's death.

{¶28} Jacob Kunkle, a special agent with the Federal Bureau of Investigation and a cell phone records analyst, mapped three cell phone numbers involved in this case—two phone numbers associated with appellant and one with Montgomery. Based on his analysis of the cell phone records, he testified regarding the location data of these phones. The data showing the phones' locations and movements were consistent with Campbell's account of how the events unfolded on the night of the murder.

{¶29} The police were able to obtain a surveillance video on Wadena Street near where the victim's burned van was discovered. When Special Agent Robert Surgenor of the Ohio Bureau of Criminal Investigation examined the footage, he found the time displayed in the video was off—it was 10 hours and 40 minutes ahead of the actual time. When the time was properly adjusted, the video showed certain events beginning at 11:41 p.m. culminating in an explosion of a vehicle. The video footage showed a vehicle, which had its headlights off, pull up, followed by another vehicle, which had the headlights on. There was then a movement of what appears to be a person towards the front vehicle— the vehicle without the headlights. Soon thereafter, that vehicle exploded, and 43 seconds after the explosion, the other vehicle left the scene. The video was played for the jury.

9

{¶30} Several months before the trial in this case, Detective Lundy heard an individual by the name of Antonio Roberson, an inmate in the county jail, allegedly confessed to the victim's murder. Detective Lundy went to interview Roberson, but he refused to talk. Detective Lundy later learned that Roberson and appellant had been housed on the same pod in the county jail.

{¶31} Detective Joseph Marche testified that Roberson had made a similar claim about another murder involving a suspect by the name of Brico Allen. However, Marche's investigation showed that Roberson was in the county jail at the time of that homicide. Furthermore, Roberson shared a pod with Allen at the time he confessed to the murder involving Allen. During the cross-examination of Detective Marche, the defense counsel alluded to Campbell's testimony that showed that she told the truth after being placed in the jail overnight, and asked Detective Marche if the jail was a "truth-telling jail." Marche agreed.

**Witness for the Defense**

{¶32} Roberson testified for the defense. He was serving a four-year prison term for aggravated robbery at the time of the trial. He testified that he did not know appellant before they were inmates on the same pod in the county jail. Before he met appellant on the pod, he heard of other inmates talking about the murder case. He first confessed to the murder to one of the inmates before he told appellant about his involvement in it. Appellant suggested that he contact appellant's attorney. On May 23, 2019, Roberson wrote to appellant's counsel and confessed to the murder in a letter.

{¶33} Roberson testified that he met the victim once or twice before the day of the murder. He did not remember the date of the murder, except that it was sometime in November 2017. On that day he ran into the victim at the Rally's near the Windermere Rapid Station in East Cleveland around 11 p.m. The

10

victim asked him about getting PCP and marijuana. They drove in the victim's vehicle to a building known as the Butternut. After Roberson got the drugs, they drove around while using drugs. They ended up on a side street, the name of which he could not recall. While high and delusional from the drugs, he got out of the vehicle and shot the victim, who was still in the driver's seat, multiple times with a 9 mm gun he had with him. He did not remember how many times he shot him, or other details about the shooting, because he was high from the drugs.

{¶34} Roberson then poured gasoline over the victim's body, using the gas from a gas can in the victim's van. After setting the vehicle on fire, he ran from the scene, carrying the gas can with him, for fear that his fingerprints would be detected. He refused to disclose where he disposed of the gas can or the gun used to kill the victim.

{¶35} When asked about his confession to the murder involving Brico Allen, he denied killing the victim in that case and only admitted selling the murder weapon to Allen. When asked about his incarceration at the time of that murder, Roberson testified that he was at a CBCF facility and he escaped the facility.

*State v. Sims*, No. 109335, 2021 WL 1423218, at *1–5 (Ohio Ct. App. April 15, 2021).

**Procedural background**

*Trial court proceedings*

In November 2017, the Cuyahoga County grand jury charged Sims with one count of aggravated murder (count 1), one count of murder (count 2), three counts of felonious assault (counts 3, 4, 5), one count of aggravated arson (count 6), one count of arson (count 7), one count of gross abuse of a corpse (count 8),

one count of tampering with evidence (count 9), and two counts of having weapons under disability (counts 10, 11). Doc. 6-1, at 6–14 (Exhibit 1). Most of the counts contained firearm specifications. *Id*. Sims was appointed counsel and pleaded not guilty. *Id*. at 16 (Exhibit 2).

In January 2018, the trial judge held a hearing to advise the parties that twelve years before the hearing, he had been appointed to represent Sims in a prior case. Doc. 6-2, at 7. The judge's representation lasted for "a couple months" until Sims retained counsel. *Id*. Sims said that he didn't remember the judge and the judge said that he didn't remember what Sims's prior case was about. *Id*. at 8. The judge stated that he did not believe there would be a conflict if he continued to handle Sims's then-current case and the parties, including Sims, agreed. *Id*. at 8–9.

In May and July 2018, Sims filed a pro se motion to appoint new counsel, Doc. 6-1, at 20 (Exhibit 4), and a request to proceed pro se, *id*. at 27 (Exhibit 5). The court granted his motion to appoint new counsel. *Id*. at 30 (Exhibit 6).

Sims, through new counsel, filed a motion for ballistics analysis at the State's expense, which the court granted. Doc. 6-1, at 35, 41 (Exhibits 8, 9). In February 2019, Sims's counsel filed a motion to withdraw because Sims had retained new counsel. *Id*. at 44 (Exhibit 10). The court granted counsel's request. *Id*. at 46 (Exhibit 11).

Meanwhile, another criminal case was pending against Sims. In that case, Sims was charged with shooting a woman outside a tavern a few months

12

before the murder-arson happened. Doc. 6-1, at 358 (Exhibit 39).[1] The State filed a motion to consolidate portions of the two cases for purposes of trial, arguing that there was a ballistics match between shell casings found outside the tavern and the shell casings found in the burned-up van. *Id*. Sims opposed the State's motion, *id*. at 49 (Exhibit 12), and the trial court denied the motion, *id*. at 80 (Exhibit 13).

In November 2019, Sims waived a jury trial on some of the firearm specifications and the two having-weapons-while-under-disability counts. Doc. 6-1, at 82 (Exhibit 14). The jury returned verdicts of guilty on all but one count and all of the corresponding firearm specifications. *Id*. at 84 (Exhibit 15). The trial court found Sims guilty of the weapons charges and the firearm specifications. *Id*. The court sentenced Sims to a total of 40.5 years to life in prison. *Id*. at 88 (Exhibit 16).

*Direct appeal*

Sims, through new retained counsel, appealed to the Ohio court of appeals and raised the following assignments of error:[2]

> 1. The state engaged in prosecutorial misconduct throughout the course of the trial that deprived defendant of his right to a fair trial.

---

[1]     The Warden did not file an authenticated copy of the State's motion, explaining that it was unable to obtain one. Doc. 6, at 11. Sims appears to dispute the accuracy of the motion. *See* Doc. 6, at 43; Doc. 7, at 7. I address this issue later, but cite Exhibit 39 here to complete the procedural narrative.

[2]     Sims's claims are reproduced as written.

2. The individual and cumulative effect of defense counsel's errors rendered counsel's performance deficient to the point of being ineffective, denying appellant his constitutional right to effective assistance of counsel.

3. The trial court erred in permitting the introduction of improper character evidence in violation of Evidence Rule 404(A)(1), denying appellant his constitutional right to a fair trial.

4. The trial court erred failing to recuse himself or in the alternative secure a valid and knowing agreement violating appellant's right to a fair trial.

5. Appellant's conviction was against the manifest weight of the evidence.

6. The state failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt.

7. The cumulative effect of the multitude of errors in this case deprived defendant of his constitutionally guaranteed right to a fair trial.

Doc. 6-1, at 110 (Exhibit 19). On April 15, 2021, the Ohio court of appeals affirmed the trial court's judgment. *Id*. at 182–219 (Exhibit 21). Sims moved for reconsideration, *id*. at 222 (Exhibit 22), which court denied, *id*. at 235–36 (Exhibit 23).

Sims, through new counsel, appealed to the Ohio Supreme Court. Doc. 6-1, at 238, 241 (Exhibits 24, 25). In his memorandum in support of jurisdiction, Sims raised the following propositions of law:

1. Cumulative prosecutorial misconduct denies a criminal defendant the right to a fair trial A defendant is denied effective assistance of appellate counsel if such counsel fails to raise meritorious

issues that were not in need of outside the record development to fully address the assignment of error.

2. When the individual and cumulative effect of defense counsel's errors render counsel's performance deficient to the point rendering the verdict unreliable, a defendant is denied his constitutional right to effective assistance of counsel.

3. The trial court commits error when it permits the introduction of state's evidence which was not timely provided as required by the Ohio Rules of Discovery and Evid.R. 401(A)(1), thus denying a defendant his Constitutional Right to a fair trial.

4. If the trial judge, prior to becoming a judge, represented the defendant appearing before him in criminal proceeding, the judge must recuse himself as the hearing judge, or in the alternative secure a valid and knowing conflict waiver from his prior client.

5. If the state failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt of Murder, R.C. 2903.02, the conviction may not be sustained.

6. The cumulative effect of multiple errors deprive a criminal defendant of his constitutionally guaranteed right to a fair trial under the Federal and State Constitution.

Doc. 6-1, at 251–52 (Exhibit 27). On December 14, 2021, the Ohio Supreme

Court declined under its rule of practice 7.08(B)(4) to accept jurisdiction of

Sims's appeal. *Id.* at 270 (Exhibit 28).

*Ohio Appellate Rule 26(B) application to reopen*

While his direct appeal was pending in the Ohio Supreme Court, Sims, through new counsel, filed in the Ohio court of appeals an application to re-open his appeal. Doc. 6-1, at 273 (Exhibit 29). In his application, he asserted that appellate counsel was ineffective for failing to raise the following assignments of error:

> 1. The Trial Court Erred in Permitting the Admission of Other Acts Evidence Against Appellant.
>
> 2. Trial Counsel was Ineffective in Failing to Present Expert Testimony on Defendant's Behalf.
>
> 3. Appellant's Conviction is Against the Manifest Weight of the Evidence, in View of the Lack of Credibility and Inconsistent Testimony of Appellant's Former Girlfriend, Erica Campbell.

Doc. 6-1, at 275–78 (Exhibit 29). On November 6, 2021, the Ohio court of appeals denied Sims's application for reopening, holding that his claims were barred by the doctrine of res judicata and lacked merit. *Id*. at 291–302 (Exhibit 31).

Sims appealed to the Ohio Supreme Court, and raised the following propositions of law:

> 1. Whether the lower court erred in denying Petitioner's motion to reopen appeal.
>
> 2. Whether Appellant counsel provided ineffective assistance in failing to specifically raise the trial court's error in permitting the admission of other acts evidence against Petitioner, in the direct appeal.

16

3. Whether Appellant counsel provided ineffective assistance in failing to raise that trial counsel was ineffective in failing to present expert testimony at trial, in the direct appeal.

4. Whether Appellant counsel provided ineffective assistance in failing to specifically raise the lack of credibility and inconsistent statements of his former girlfriend, in the direct appeal.

Doc. 6-1, at 309 (Exhibit 33). On January 18, 2022, the Ohio Supreme Court declined to accept jurisdiction. *Id.* at 330 (Exhibit 34).

*Federal habeas corpus petition*

On November 22, 2022, Sims filed a federal habeas corpus petition under 28 U.S.C. § 2254. Doc. 1. He raised the following grounds for relief:[3]

**Ground one**: Prosecutorial misconduct

**Ground two**: Ineffective Assistance of Counsel

**Ground three**: Admission of Improper Other Acts

**Ground four**: Prejudicial Judicial Conflict

**Ground five**: Introduction of Other Weapons Evidence

**Ground six**: Unreasonable Application of Harmless Error Analysis

**Ground seven**: Sufficiency of Evidence

---

[3]     Sims's description of his habeas grounds spans 23 pages. *See* Doc. 1-2, at 6–29. So I have omitted here his supporting facts.

**Ground eight**: Unreasonable Application of Facts

Doc. 1-2, at 6–29. The Warden filed a Return of Writ, Doc. 6, and Sims filed a traverse, Doc. 9.

### Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214, petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when state court remedies are no longer available, procedural default rather than exhaustion applies. *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas

corpus action. 28 U.S.C. § 2254(b),(c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts") (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). And a habeas petitioner must present both the factual and legal underpinnings of the claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id*. In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: whether (1) there is a state procedural rule applicable to the petitioner's claim and whether the

petitioner failed to comply with that rule; (2) the state court enforced the procedural rule; (3) the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806.

To overcome a procedural bar, petitioners must show cause for the default and actual prejudice that resulted from the alleged violation of federal

law that forms the basis of their challenge, or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218, 231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must then show that state's court's adjudication "was *contrary to*," or "involved an *unreasonable application* of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1) (emphasis added); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court

may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n 'unreasonable application of'" the Court's holdings is one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law' refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting *White*, 572 U.S. at 419). A state court is not required to cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard.

22

*Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Discussion**

For convenience, I discuss Sims's grounds out of numeric order.

*Ground seven fails on the merits*

In ground seven, Sims argues that there was insufficient evidence to convict him of murder. Doc. 1-2, at 27–28. When reviewing a claim that a petitioner's conviction is not supported by sufficient evidence, the court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Cavazos v. Smith*, 565 U.S. 1, 7 (2011). The court defers to the trier-of-fact's determination. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The standard is not whether the trier-of-fact made the correct guilt or innocence determination, but whether it made a rational decision to convict or

acquit. *Herrera v. Collins*, 506 U.S. 390, 402 (1993). The court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [fact-finder]." *Brown*, 567 F.3d at 205; *see also Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal quotations and citations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012). So even if this Court were to conclude that a rational trier-of-fact could not have found Sims guilty beyond a reasonable doubt, the Court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

On appeal, Sims raised a sufficiency-of-the-evidence claim and a manifest-weight-of-the-evidence claim. *Sims*, 2021 WL 1423218, at \*6. The Ohio court of appeals recited the proper sufficiency-of-the-evidence standard. *Id*. It explained that because Sims's claims focused on Campbell's credibility,

24

it would evaluate both of the claims under the manifest-weight standard.[4] *Id*.

at 7. The court evaluated Sims's claims as follows:

> {¶43} Appellant claims, without specificity, that Campbell's testimony was contradicted by other witnesses. The claim is not borne out by our review of the transcript. Campbell testified that she met appellant at Montgomery's house that evening. After receiving a phone call from Boyd, he asked her to take him to the victim's car lot, where several people, including the victim, had congregated. After she dropped appellant off, she was about to leave when she heard some commotion and saw in her rearview mirror appellant placing the victim in a headlock and punching him.

> {¶44} Campbell testified that, because of the fighting, others started to leave the car lot. Eventually only appellant and the victim remained at the lot. When the victim was about to leave, appellant closed the gate to the lot. Campbell saw appellant walking toward the victim and then heard gunshots. Appellant ran to her vehicle and got in. She saw him holding a gun, which she had seen him carrying before. Appellant appeared shocked, saying "me and Unc [referring to Boyd] going to fall out about this." Appellant returned to the car lot, turned off the lights of the victim's van, and then called Montgomery for help. After picking up Montgomery from his house, they stopped at a gas station and appellant had Campbell purchase two pairs of gloves and a gas can and then fill the can with gasoline. They returned to the car lot, and appellant drove the victim's van eventually to Wadena Street, while Campbell and Montgomery followed behind in her vehicle. Once there, appellant got out of the victim's vehicle and poured gas over the vehicle. Campbell then heard a loud boom.

---

[4]     The Ohio court of appeals' approach is proper under Ohio law. *See, e.g.,* *Nash v. Eberlin*, 258 F. App'x 761, 765 (6th Cir. 2007).

{¶45} Our review indicates that Campbell provided a lengthy, coherent, and consistent account of the events on the night of the murder. Her testimony is consistent with other witnesses who testified that a fight broke out between appellant and the victim after appellant arrived at the car lot. Notably, the particulars of her account are corroborated by the testimony of the cellphone records analyst, who testified in great detail regarding his analysis of appellant's and Montgomery's cell phone records. The cell phone location analysis based on phone calls and text messages between appellant and Montgomery revealed appellant's and Montgomery's locations and movement throughout the evening, and they matched Campbell's account of how the events unfolded.

{¶46} In addition, Campbell's description of how the victim's vehicle was burned is corroborated by the surveillance video from Wadena Street. The video footage shows a car without its headlights pulled up and it was followed by another car. There was a movement of what appears to be a person toward the first car. Soon afterward, that car exploded, and moments later, the other car left the scene.

{¶47} Without any specifics, appellant claims Campbell is untruthful. While we review witness credibility as part of a manifest-weight analysis, we are mindful that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Here, our own review of the trial transcript does not reveal any inconsistency in Campbell's testimony, which is amply corroborated by other evidence presented by the state. After weighing the evidence and all reasonable inferences and considering the credibility of witnesses, we cannot say that the jury, in finding appellant guilty, clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice. The sixth and seventh assignments of error are without merit.

*Sims*, 2021 WL 1423218, at *7–8.

Sims complains that "the only evidence of his involvement in the crimes charged was offered by Erica Campbell." Doc. 1-2, at 27–28. He questions Campbell's motives because Campbell changed her story after she was arrested and placed in a dirty jail cell. *Id*. But a court reviewing a sufficiency claim "does not re-evaluate the credibility of witnesses." *Brown*, 567 F.3d at 205. And the jury heard Campbell testify that she changed her story after she was arrested and placed in a dirty jail cell. Doc. 6-9, at 117–31; *see Brown*, 567 F.3d at 205 (the court does not "substitute [its] judgment for that of the [fact-finder].").

Sims complains that Campbell didn't see him shoot the victim or set fire to the van. Doc. 1-2, at 28. But the jury heard Campbell say that she saw Sims lock himself in the car lot with the victim after everyone else had left, walk towards the van where the victim was, and then she heard gunshots. Doc. 6-9, at 77–80. Later that night, Campbell saw Sims pour gas on the van and then saw the van erupt in flames. *Id*. at 100. This is circumstantial evidence that Sims shot the victim and set fire to the van, which is sufficient to support a conviction. *See Johnson*, 200 F.3d at 992; *see also Cavazos*, 565 U.S. at 7 ("a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at

326). Moreover, cell phone records corroborated Campbell's testimony, as the Ohio court of appeals observed. *Sims*, 2021 WL 1423218, at *7.

Sims also argues that "there is no evidence that the harm from the fight met the standard of serious physical harm." Doc. 1-2, at 28. But he doesn't identify which count this statement challenges, so his argument fails.

*Ground eight fails on the merits*

In ground eight, Sims argues that the Ohio court of appeals' decision was based on an unreasonable application of the facts. Doc. 1-2, at 28; *see* 28 U.S.C. § 2254(d)(2). He argues that the Ohio court of appeals when evaluating the sufficiency of the evidence "gave dispositive weight to Campbell's testimony though her testimony was contradicted by other state evidence." Doc. 1-2, at 28. The "other evidence" Sims cites is the fact that Campbell didn't see the shooting and said that she saw Sims "with a gun which could not have been the gun used in the crime." *Id.* at 29. But the Ohio court of appeals stated and applied the correct sufficiency-of-the-evidence standard—a court "is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'" *Sims*, 2021 WL 1423218, at *6 (quoting *State v. Thompkins*, 678 N.E.2d 541 (1997)); *see also Jackson*, 443 U.S. at 319. This was not an unreasonable application of the facts.

Sims contends that the cellphone records do not corroborate Campbell's testimony, as the court found. Doc. 1-2, at 29. He submits that the cell phone data doesn't support Campbell's assertion that she and Sims stopped at her

28

home after driving Montgomery home. *Id*. But Sims hasn't shown that he made or received any calls or texts on the drive to or from Campbell's home, so he hasn't shown that there was any data that would have shown up on a cell phone record. *See* Doc. 6-10, at 10–12 (cell phone records analyst explaining that only "call activity" from a cell phone shows up on phone records, from which a general location can be determined).

Finally, Sims says that the Ohio court of appeals' statement—"our own review of the trial transcript does not reveal any inconsistency in Campbell's testimony, which is amply corroborated by other evidence presented by the state"—is unreasonable. Doc. 1-2, at 29. He submits that Campbell described the gun that Sims was holding when he returned to her car after the shooting, but argues that the firearms expert testified that the gun Campbell described could not have been used to shoot the victim. Doc. 1-2, at 29. Sims doesn't provide a transcript citation to the testimony he relies on. For that reason alone, his argument fails. *See Wenglikowski v. Jones*, 306 F. Supp. 2d 688, 695 (E.D. Mich. 2004) ("It is not the role of the district court to scour the petitioner's trial transcript to find support for the arguments in his habeas corpus petition"), *aff'd in part on other grounds*, 162 F. App'x 582 (6th Cir. 2006); *see also Burt v. Titlow*, 571 U.S. 12, 18 (2013) (a petitioner must show, "by clear and convincing evidence," that the court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.") (quoting 28 U.S.C. § 2254(d)(2), (e)(1)). Moreover,

Campbell didn't see Sims shoot the victim, so she didn't testify about what gun he used to do it.

Because Sims hasn't shown that the Ohio court of appeals' decision was based on an unreasonable application of the facts, ground eight fails on the merits.

*Ground one fails on the merits*

In ground one, Sims argues that the prosecutor engaged in misconduct. Doc. 1-2, at 6. By way of background, Sims was indicted in an earlier case for a shooting that occurred outside a tavern. *See, e.g.*, Doc. 6-1, at 56. The State sought to consolidate some of the charges in the tavern case with the charges in the arson-murder case because the ballistics evidence showed that the shell casings found at the two locations matched. *See id.* at 56; *Sims*, 2021 WL 1423218, at *8. The trial court denied the State's motion. Doc. 6-1, at 80. At a pre-trial hearing, the State indicated that it "will seek some clarity as to the 404(B) aspect of" the joinder motion.[5] Doc. 6-2, at 45. Before opening statements, the trial court discussed with counsel the State's request to mention during its opening statement "identification evidence"—ballistic evidence that showed the shell casings in the arson-murder case matched casings found in the tavern case and that Sims was linked to the tavern case. Doc. 6-4, at 22–25. The trial court ruled in favor of the State. *Id.* at 24–25. And

---

[5]     This motion was called a motion to "consolidate" but the parties and the court routinely called it a "joinder" motion. *See, e.g., Sims*, 2021 WL 1423218, at *8, 11. So I do, too.

the prosecutor's resulting comment is what Sims challenges here. Doc. 1-2, at 7–8.

One initial matter. Sims alleges that the State, in its joinder motion, "moved the court to admit evidence of the other shooting as Ohio R. 404([B]) other acts evidence" and that the trial court "denied that motion in its entirety." Doc. 1-2, at 7. It's not clear why Sims presses this issue, but his characterization of it is not supported by the record. True, the state court record in this case lacks an authenticated version of the State's joinder motion. *See* Doc. 6, at 10 (the Warden explaining that the clerk's office didn't have the motion, so he filed a version obtained "directly from the prosecutor"). The unauthenticated version of the joinder motion the Warden filed does not contain a request to admit other-acts evidence under Ohio Evidence Rule 404(B). Doc. 6-1, at 358–60. Sims's opposition brief to the State's motion doesn't include a response to a Rule 404(B) argument, *id*. at 49–59, which one would expect if the State had raised it in its motion.[6] In his Traverse, Sims contends that "the trial record is clear that the state intended the motion as a 404(B) motion and the trial court understood it as a 404([B]) motion." Doc. 9, at 7. In support, he cites portions of the trial court's hearing on the Rule 404(B) issue, *id*. at 7–9, but nothing in the transcript shows that it is "clear" that the State in its joinder motion requested a Rule 404(B) ruling. *See also* 6-2, at 44–45;

---

[6]    The joinder issue, by its nature, implicated the admissibility of evidence. But that's different than a stand-alone motion under Ohio Rule of Evidence 404(B).

Doc. 6-4, at 22–25. Instead, the record shows that at a pre-trial hearing, the State indicated that it "will seek some clarity as to the 404(B) aspect of" the joinder motion, Doc. 6-2, at 45, and before opening statements the court issued its Rule 404(B) ruling, Doc. 6-4, at 22–25. In any event, whether the Rule 404(B) issue was expressly raised in the joinder briefs is not pertinent to the outcome of this issue.[7]

When reviewing a claim of prosecutorial misconduct, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*

---

[7]    This case is similar to *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008), because both cases involve (1) a claim alleging that a prosecutor engaged in *misconduct* when presenting other-acts evidence that the trial court expressly permitted under a state evidentiary rule, and (2) a defendant who didn't appeal the trial court's evidentiary ruling. *Cristini* found that "the prosecutor's use of the evidence had already been ruled acceptable by the trial judge under Rule 404(b), and he made his argument in good faith reliance on that ruling." *Id*. The court reasoned that "[u]nless the prosecutor's argument involves comment upon evidence that the Supreme Court has ruled violative of Constitutional guarantees, the proper course of action is an appeal of the state evidentiary ruling, not an appeal based on the prosecutor's reliance on the ruling." *Id*. Here, the prosecutor relied on other-acts evidence, but the Supreme Court has not held that a bar on other-acts evidence is a constitutional guarantee. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence"). Like in *Cristini*, Sims's claim would fail. But *Cristini* is not Supreme Court precedent, so I apply AEDPA deference to the Ohio court of appeals' decision under the governing Supreme Court standard. I mention *Cristini* because it illustrates the problem with a claim alleging prosecutorial misconduct when there is no showing that any misconduct occurred.

*v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416

U.S. 637 (1974)). The Ohio court of appeals considered Sims's claim as follows:

> {¶52} Appellant claims on appeal that the prosecutor
> engaged in misconduct by informing the jury in the
> state's opening statement that appellant was linked
> to another shooting, in violation of the court's ruling
> denying the state's motion for a joinder. Appellant
> refers us to the following remark by the prosecutor
> in the state's opening statement:
>
>> I mentioned earlier that there was a
>> nine-millimeter casing recovered in the
>> engine block of the vehicle. That will be
>> an important piece of information for
>> you.
>>
>> The reason it will be important is you
>> will hear that casing was submitted
>> through a system called NIBIN, which
>> kind of matches up that casing with
>> any other known casing that has been
>> recovered. And after, there's a match;
>> and that case matches to another
>> incident, and it's associated with
>> another incident with Jerry Sims.
>
> {¶53} Appellant claims the prosecutor engaged in
> further misconduct when the prosecution, despite
> the court's denial of a joinder, introduced the
> testimony of Kooser, a firearms examiner, who
> testified that he was able to determine that the
> spent casing found in the engine compartment of the
> burned vehicle matched nine spent casings
> recovered from a different crime scene in Cleveland;
> they had been fired from the same 9 mm caliber
> pistol. Appellant claims the ballistic evidence
> regarding the other case constituted improper other-
> acts evidence pursuant to Evid.R. 404(B), which
> provides that "[e]vidence of other crimes, wrongs, or
> acts is not admissible to prove the character of a
> person in order to show that he acted in conformity
> therewith."

{¶54} We note that on appeal appellant does not claim that the trial court erroneously admitted allegedly improper other-acts evidence. Rather, appellant frames his claim in terms of prosecutorial misconduct. Therefore, we apply the standard of review for prosecutorial misconduct to his claim.

{¶55} The standard of review for prosecutorial misconduct is whether the actions by the prosecution were improper and, if so, whether they prejudiced a defendant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 2, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶56} The state introduced testimony regarding ballistic comparison evidence to show that whoever was involved in the instant case was also involved in another shooting incident—the testimony itself did not directly link appellant to the shell casings found in either shootings but only showed the shell casings were fired from the same firearm. At the opening statement, however, the prosecutor stated to the jury that the other incident was associated with appellant—despite that appellant had not been convicted in that case.

{¶57} While the ballistic comparison evidence may arguably be improper other-acts evidence given the prosecutor's remark at the opening statement, the question is whether the prosecutor's conduct prejudiced appellant's substantial rights. When assessing whether the prosecutor's comment results in prejudice affecting a defendant's substantial rights, we consider factors such as (1) the nature of the remark, (2) whether an objection was made by counsel, (3) whether the court gave curative instructions, and (4) the general strength of the evidence against the defendant. *State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342 (8th Dist.1995).

34

{¶58} Here, although the trial court advised the defense that it would provide a curative instruction to the jury if requested by the defense, the defense did not object or ask for such instruction when the prosecutor alluded to the other case at the opening statement. More importantly, were the ballistic evidence the only evidence implicating appellant in the victim's murder, the prosecutor's remark that appellant was associated with the other shooting may have been highly prejudicial. As we have discussed above, however, the state presented overwhelming, well-corroborated testimonial evidence to prove appellant's guilt at trial. Considering the prosecutor's conduct in the context of the entire trial and balancing the nature of the prosecutor's remark, the lack of objection or request for a curative instruction, and the strength of the evidence against appellant, we do not find the prosecutor's conduct prejudicially affected appellant's substantial rights or denied him a fair trial.

*Sims*, 2021 WL 1423218, at 9–10. The Ohio court of appeals applied the correct standard to Sims's prosecutorial misconduct claim. *See Stermer v. Warren*, 959 F.3d 704, 726 (6th Cir. 2020) ("the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error") (quoting *United States v. Young*, 470 U.S. 1, 12 (1985)).

Sims argues that the prosecutor "misstate[d] and manipulate[d] the evidence" because Sims wasn't convicted in the tavern case and the ballistics evidence didn't link either shooting to Sims. Doc. 9, at 10. But at the time of

35

Sims's trial, the tavern case was still pending against Sims.[8] *See State v. Sims*, Cuyahoga County Court of Common Pleas, Case No. CR-17-623069-A. The prosecutor did not misstate this fact.[9] *See* Doc. 6-4, at 23. And the fact that the ballistics evidence didn't link either shooting to Sims became apparent at trial. *See* Doc. 6-7, at 14–21 (Detective Lundy's testimony in which Lundy agreed that Sims's firearms recovered by the police were not a ballistics match to the casings found in either case); Doc. 6-7, at 118–24, 126–30 (firearm expert testifying that ballistics evidence showed that the same gun was used in the tavern and arson-murder shootings but that the gun had not been recovered); *see also Sims*, 2021 WL 1423218, at *9 (observing that the testimony at trial didn't link Sims "to the shell casings found in either shootings but only showed the shell casings were fired from the same firearm"). Indeed, the prosecutor didn't mention the tavern shooting during closing argument or reference a ballistics match. Doc. 6-8, at 197–219, 253–66. Defense counsel's closing argument reiterated that none of Sims's guns seized by the police matched the gun used in the arson-murder case. *Id.*, at 243–44. In other words, the

---

[8]     In February 2020, the State dismissed without prejudice the charges against Sims in the tavern case. *See* https://cpdocket.cp.cuyahogacounty.us/CR_CaseInformation_Docket.aspx?q=lawCXhntIsePmNKOsK0xHA2.

[9]     The prosecutor accurately told the trial court that Sims was "suspected of being a part of that additional scene [at the tavern shooting]." Doc. 6-4, at 23. The prosecutor said he was "trying to sanitize the language as much as possible at this point because we're not sure exactly how much of this evidence will be coming in later in the trial" and that he would "try to make [the statements] as innocuous as possible." *Id*. at 24.

prosecutor's comment during opening statements suggesting that ballistics evidence linked Sims to both crimes was an isolated comment.[10] And the Ohio court of appeals' consideration of all of the evidence when evaluating Sims's prosecutorial misconduct claim was proper. *See Young*, 470 U.S. at 12; *see also Donnelly*, 416 U.S. at 646 (The 'consistent and repeated misrepresentation' of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions"); *cf. Miller v. Pate*, 386 U.S. 1, 6 (1967) (habeas relief warranted when the prosecutor's repeated assertions throughout trial that blood-stained shorts linked the defendant to the crime "deliberately misrepresented the truth" because the shorts were not stained with blood but with red paint, which the prosecutor had known all along).

Sims objects to the Ohio court of appeals' finding that "the state presented overwhelming, well-corroborated testimonial evidence to prove appellant's guilt at trial." Doc. 9, at 11. He argues that "none of the testimonial evidence presented … established that Sims was the perpetrator" and that "no physical evidence was presented inculpating Sims." Doc. 9, at 11. But

---

[10]    Sims argues that in addition to opening statements, the prosecutor "elicited statements from its witnesses claiming—without proving—that Sims was involved in another shooting." Doc. 9, at 10. Sims doesn't identify witnesses or cite transcript pages to support this assertion. So he's forfeited this argument. *See Wenglikowski*, 306 F. Supp. 2d at 695 ("It is not the role of the district court to scour the petitioner's trial transcript to find support for the arguments in his habeas corpus petition").

Campbell's testimony placed Sims at the scene at the time of the murder and arson and this testimony was corroborated by cell phone records and video evidence, as the Ohio court of appeals found. *Sims*, 2021 WL 1423218, at *2–3, 5, 7–8. Sims argues that the facts in his case are like the facts in *Darden*.[11] Doc. 9, at 10–12. But he hasn't shown that the Ohio court of appeals' finding that on balance the prosecutor's conduct didn't deprive Sims of a fair trial "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *See Harrington*, 562 U.S. at 103. Ground one fails on the merits.

*Ground two fails on the merits*

In ground two, Sims argues that trial counsel was ineffective because he "failed to object to the state[']s numerous attempts to admit evidence that [Sims] was involved in a separate shooting event." Doc. 1-2, at 11. But he doesn't identify what "numerous attempts to admit evidence" linking him to a separate shooting event he believes counsel should have objected to. *See* Doc. 1-2, at 9–13; Doc. 9, at 13–14. For this reason alone, the Court could find that Sims is not entitled to relief on ground two.

Even if the Court were to consider ground two based on the facts that Sims presented on direct appeal, it would fail on the merits. A successful

---

[11]    In *Darden*, the Supreme Court rejected the petitioner's prosecutorial misconduct claim. 477 U.S. at 181.

38

ineffective-assistance claim requires a petitioner to demonstrate that: (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Jones v. Bradshaw*, 46 F.4th 459, 487–88 (6th Cir. 2022) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "The first prong is satisfied when a petitioner 'show[s] that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Jones*, 46 F.4th at 487 (quoting *Strickland*, 466 U.S. at 694). "The second prong is satisfied when the petitioner 'show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones*, 46 F.4th at 487–88. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jones*, 46 F.4th at 488 (quoting *Strickland*, 466 U.S. at 694). The combined effect of *Strickland* and 28 U.S.C. § 2254(d) is "'doubly deferential'" review. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "When 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105; *Foust v. Houk*, 655 F.3d 524, 533–34 (6th Cir. 2011).

*Strickland* commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689–90; *Pinholster*,

563 U.S. at 196 ("[t]he Court of Appeals was required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons *Pinholster's* counsel may have had for proceeding as they did'") (citation omitted).

Here, the Ohio court of appeals recited the *Strickland* standard and addressed Sims's claim as follows:

### a. Alleged Failure to Object to Ballistic Evidence

{¶65} Appellant argues his trial counsel was ineffective in failing to object to the state's admission of the ballistic comparison evidence at trial. He raises the claim even though his trial counsel had filed a brief opposing the joinder on the ground of impermissible Evid.R. 404(B) evidence and obtained a favorable ruling from the trial court.

{¶66} The record reflects that, after the trial court's ruling denying the state's motion for a joinder, the ballistic evidence was discussed at a side bar in advance of the opening argument and presentation of the state's evidence. The defense counsel continued to object to the ballistic evidence, and the trial court cautioned the state that its opening statement should be consistent with its ruling denying joinder. *State v. Sands*, 11th Dist. Lake No. 2007-L-003, 2008-Ohio-6981, ¶126 (appellant's claim that his counsel failed to make contemporaneous objections lacked merit because the testimony objected to was discussed at a side bar ahead of the presentation of testimony; rulings and limitations were made on the record thereby counsel properly preserved the issue for appeal). Appellant's trial counsel did not provide ineffective assistance of counsel in this regard.

**b. Alleged Failure to Object to Other-Weapons Evidence**

{¶67} Appellant also argues that his trial counsel should have objected to testimony of several witnesses who mentioned that they have seen appellant carrying weapons in light of the fact that all of the weapons the police found on appellant's person when he was arrested had been ruled out as the murder weapon.

{¶68} Michael Smith testified that when appellant hit the victim with a wine bottle, he saw appellant with a black gun on his hip. Detective Lundy testified there were several guns found with appellant at the time he was arrested. During his testimony, the seized guns were introduced as evidence. Erica Campbell testified that she had seen appellant carrying guns. She also testified that the detectives had shown her a gun retrieved from appellant when he was arrested and she recognized the gun to be appellant's gun, which he purchased ten days after the murder and she was with him when he purchased the gun. The defense counsel did not object on these occasions.

{¶69} Appellant cites *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, in support of his claim. In *Thomas*, the trial court admitted evidence that the defendant possessed a collection of five knives, none of which were related to the knife that was used to stab the victim. The actual knives were introduced as evidence, along with photographs of the knives. The prosecutor described the defendant as an owner of "full Rambo combat knives." *Id.* at ¶ 35. In addition, during closing arguments, the state referred to the collection of knives and held one up to the jury as the prosecutor alluded that the knife was similar to the murder weapon. The plurality opinion in *Thomas* held that that other-weapons evidence, i.e., irrelevant evidence of weapons unrelated to the charges, is inadmissible as it falls within the scope of Evid.R. 404(B), which precludes evidence of other acts "to

prove the character of a person in order to show action in conformity therewith." *Id*. at ¶ 35-36. The plurality opinion reversed the defendant's conviction of aggravated murder under a plain error analysis, concluding that the unrelated weapons evidence was highly prejudicial and there was a reasonable probability that the inadmissible evidence affected the outcome of the trial.

{¶70} Pursuant to *Thomas*, the testimony of Campbell and Lundy as well as the introduction of the firearms recovered by the police when appellant was arrested was arguably other-weapons evidence. However, as *Thomas* noted, that "[e]rror in admitting other weapons evidence falls generally into one of two categories: harmless error or prejudicial error requiring reversal." *Id*. at ¶38. "Cases in which courts have deemed error in the admission of other weapons evidence to be harmless generally involved overwhelming independent evidence of guilt." *Id*. at ¶39. In other words, whether the alleged error was prejudicial depends on the strength and amount of independent evidence against the defendant. The plurality opinion in *Thomas* found the error to be prejudicial because it found the case against the defendant not to be a case of overwhelming independent evidence of guilt. *Id*. at ¶41.2

{¶71} Here, appellant does not claim the trial court erred in admitting the other-weapons evidence but, rather, his trial counsel provided ineffective assistance in failing to object to the evidence. We note that while *Thomas* reviewed the other-weapons evidence under a plain error analysis, i.e., the accused must demonstrate a reasonable probability that the error resulted in prejudice, this is the same deferential standard for reviewing ineffective assistance of counsel claims, as the court observed in *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶22.

{¶72} Thus, even if assuming that the other-weapons evidence presented through the testimony of

42

Campbell and Lundy and the admission of firearms seized at the time of appellant's arrest were inadmissible pursuant to *Thomas*, appellant must demonstrate that there is a reasonable probability that the result of the trial would have been different if counsel were to object to the other-weapons evidence. Given the substantial independent evidence supporting appellant's guilt produced by the state, we are unable to reach that conclusion regarding Campbell's and Lundy's testimony and the evidence regarding the seized firearms. *See also State v. Gordon*, 2018-Ohio-2292, 114 N.E.3d 345, ¶ 79-80 (8th Dist.) (where there was substantial evidence independent of the defendant's guilt, the other-weapons testimony was harmless).

{¶73} Smith's testimony, however, is of a different nature. Among the cases cited by the plurality opinion in *Thomas* to support its holding was *State v. Crosby*, 186 Ohio App.3d 453, 2010-Ohio-1584, 928 N.E.2d 795, ¶ 16 (8th Dist.). Although *Crosby* held that other weapons evidence unrelated to the weapon involved in the offense was not admissible, *Crosby* noted that the court has allowed testimony that the defendant was seen with a gun if the defendant's possession of the gun had a "temporal and spa[t]ial proximity" to the crime in question even though the gun seen was not necessarily the gun involved in the offense. *Id*. at 458, 928 N.E.2d 795, ¶16, citing *State v. Davis*, 8th Dist. Cuyahoga No. 35421, 1977 WL 201136, 1977 Ohio App. LEXIS 7152 (Jan. 6, 1977). *See also State v. Hamilton*, 8th Dist. Cuyahoga No. 97145, 2012-Ohio-1542, ¶ 31.

{¶74} Smith testified that he saw appellant with a gun on his hip when he hit the victim with a wine bottle at the car lot, an event that occurred shortly before the victim was shot, according to Campbell's account of the events. Because the testimony shows appellant possessing a gun in close proximity to the murder, both in time and place, this testimony would not be inadmissible other-weapons evidence, pursuant to *Crosby*, *Hamilton*, and *Davis*.

{¶75} The second assignment of error is without merit.

*Sims*, 2021 WL 1423218, at *10–12.

In his petition, Sims argues that the Ohio court of appeals failed to establish how Sims's case differed from *Thomas*, 92 N.E.3d 821. Doc. 1-2, at 12. But the question here isn't whether the Ohio court of appeals properly distinguished the facts of an Ohio Supreme Court case on the admissibility of other-weapons evidence. Rather, the question is whether the Ohio court of appeals unreasonably applied the *Strickland* standard. *See Harrington*, 562 U.S. at 105. Sims says that the Ohio court of appeals "was not clear as to what 'substantial independent evidence supporting appellant's guilt' it relied on" when discussing the prejudice prong. Doc. 1-2, at 13. But earlier in its decision the Ohio court of appeals addressed Sims's sufficiency and manifest weight claims and detailed the evidence it relied on when rejecting these claims. *Sims*, 2021 WL 1423218, at *6–8. It was not required to restate this evidence.

Finally, Sims submits that the court unreasonably applied *Strickland* because it "assumed error but did not engage in a second prong of the *Strickland* analysis." Doc. 9, at 14. But the court applied *Strickland's* second, prejudice prong when it found that Sims had not "demonstrate[d] that there is a reasonable probability that the result of the trial would have been different if counsel were to object to the other-weapons evidence." *Sims*, 2021 WL 1423218, at *12; *see Harrington*, 562 U.S. at 104 ("With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different")
(quoting *Strickland*, 466 U.S. at 694)). Ground two fails on the merits.

*Grounds three and five are procedurally defaulted*

In ground three, Sims argues that the trial court erred when it
permitted the State to introduce other-acts evidence at trial. Doc. 1-2, at 13.
He identifies this evidence as "ballistic comparison evidence, evidence of other
firearms, and statements about [Sims] allegedly being involved in another
shooting." Doc. 9, at 14. The Warden argues that ground three is procedurally
defaulted because Sims failed to present it to the Ohio court of appeals on direct
review. Doc. 6, at 55–56. In his Traverse, Sims doesn't disagree that he failed
to present this claim to the Ohio court of appeals on direct review. Doc. 9, at
15–17.

Because this claim is based on the trial court record, it should have been
raised on direct appeal. *See Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)
("Ohio courts have consistently held that claims that can be adjudicated based
on facts in the record can only be presented on direct appeal") (citing *State v.
Lentz*, 639 N.E.2d 784, 785 (Ohio 1994)). Sims didn't raise this claim to the
Ohio court of appeals on direct review, so it is procedurally defaulted. *See Buell*,
274 F.3d at 349; *see O'Sullivan*, 526 U.S. at 845 (a petitioner must present a
claim to the state appellate court and the state supreme court for discretionary
review or it is procedurally defaulted).

Sims asserts that he raised this claim to the Ohio Supreme Court. Doc. 9, at 15. But he doesn't identify where in the record he purportedly did so. *Id*. Review of the record shows that he did not raise this claim to the Ohio Supreme Court. Doc. 6-1, at 251–52. Even if he had, doing so would not have cured the procedural default. *See Castille v. Peoples*, 489 U.S. 346, 349–51 (1989) (raising a claim for the first time to the highest state court on discretionary review is not "fair presentation" for purposes of exhausting a federal habeas claim).

Sims also contends that he raised this claim in his Ohio Rule 26(B) application to reopen. Doc. 9, at 16. But a Rule 26(B) application to reopen is the method to raise ineffective assistance of appellate counsel. *See* Ohio App. R. 26(B)(1). Indeed, Sims presented in his Rule 26(B) application a claim that appellate counsel was ineffective for failing to challenge on direct appeal the trial court's other-acts evidentiary ruling. Doc. 6-1, at 275–76. But "bringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because 'the two claims are analytically distinct.'" *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) (quoting *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005)).

Sims has not alleged cause or prejudice to excuse the procedural default of ground three or actual innocence to overcome it. Ground three is procedurally defaulted.

Ground five is called "Introduction of Other Weapons Evidence." Doc. 1-2, at 20. Sims doesn't provide factual details in support of this claim. He failed to raise an other-weapons-evidence claim on direct appeal, so ground five is procedurally defaulted for the same reasons as ground three. *See also* Doc. 9, at 20 (Sims's Traverse incorporating into ground five his arguments about ground three).

*Ground four is procedurally defaulted and fails on the merits*

Ground four is a judicial-bias claim. Doc. 1-2, at 16. Sims explains that the trial judge used to be a defense attorney who represented Sims in other criminal cases. Doc. 1-2, at 16. He argues that the trial judge "had personal knowledge of alleged prior acts which would not otherwise have been properly before the court" and "commented that he had been fired by the defendant, indicating that he was familiar with his prior dealings with [Sims]." *Id*. at 20.

The Due Process Clause requires a "'fair trial in a fair tribunal' … before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (citations omitted); *see Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002)). Moreover:

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality

challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible …. *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States*, 510 U.S. 540, 555–56 (1994).[12]

As an initial matter, in his direct appeal to the Ohio court of appeals Sims presented his judicial bias claim only as a state law violation, not a federal constitutional violation.[13] Doc. 6-1, at 129–32. So he has procedurally defaulted his judicial bias claim. *See Baldwin v. Reese*, 541 U.S. 27, 32–33 (2004) (a claim isn't fairly presented to a state court if the petitioner "does not alert it to the presence of a federal claim").

---

[12]     *Liteky* interpreted judicial bias under a federal statute, 28 U.S.C. § 455(a). 510 U.S. at 451. Nevertheless, the Sixth Circuit has applied the *Liteky* standard to federal habeas claims alleging constitutionally impermissible judicial bias. *See, e.g., Mason v. Burton*, 720 F. App'x 241, 245 n.2 (6th Cir. 2017) (explaining that the Sixth Circuit applies *Liteky* in federal habeas cases even though *Liteky* interpreted a federal statute, rather than the due process clause, and assuming, without deciding, that *Liteky* applies in federal habeas context).

[13]     *See, e.g., Bracy*, 520 U.S. at 904 ("Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard … Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar") (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986)).

48

Even if the Court were to consider Sims's procedurally defaulted claim, it would fail on the merits. The Ohio court of appeals rejected Sims's claim that the trial judge should have recused himself as follows:

**Recusal**

{¶90} Under the fifth assignment of error, appellant claims the trial judge presiding over this case should have recused himself from the case because the judge had represented him in four prior cases.

{¶91} Canon 3(E)(1)(b) of the Code of Judicial Conduct requires a judge to be disqualified if he or she has "served as a lawyer in the matter in controversy." *State v. Smith (In re Berens)*, 117 Ohio St.3d 1235, 2005-Ohio-7155, 884 N.E.2d 1088, ¶ 4. Moreover, "[p]rior representation of a party by a judge * * * on matters wholly unrelated to matters presently pending before the judge does not mandate judicial disqualification, absent a specific showing of actual bias on the part of the judge." RO 110. "[T]he prevalent American rule of disqualification is limited to instances in which the judge participated as a lawyer in an earlier stage of the same case. Under this majority rule, unless there is a specific showing of bias, a judge is not disqualified merely because he or she worked as a lawyer for or against a party in a previous, unrelated matter." *Smith* at ¶ 5, quoting *Mustafoski v. State*, 867 P.2d 824, 832 (Alaska App. 1994). "A judge in a criminal case is not required to disqualify himself simply because he may have previously represented the defendant in some unrelated matter." *Id*., quoting *Kilgore v. Maass*, 89 Ore. App. 489, 492, 749 P.2d 1201 (1988). However, a judge should "uphold and promote the independence, integrity, and impartiality of the judiciary" and avoid "the appearance of impropriety." Canon 1 of the Code of Judicial Conduct.

{¶92} Here, the trial judge presiding over the trial had represented appellant as counsel or co-counsel

in four prior criminal cases in 2006 and 2007. Aware of the potential appearance of conflict, the judge addressed this issue in open court prior to the trial and made a record of the discussion on this issue. The trial judge stated that his representation of appellant occurred 12 years ago and he did not remember much about the cases and he did not believe there was a conflict. Appellant stated he did not remember being represented by the trial judge in the prior cases.[] An attorney who was co-counsel with the trial judge in one of the prior cases was present at this hearing and he represented to the trial judge that he had talked to appellant and appellant "has no problems with [the trial judge] going forward handling this case." Appellant's counsel in this case also indicated on the record that counsel did not perceive a conflict and had no objections.

{¶93} In *Smith*, the court found no grounds for disqualification, noting that the trial judge did not represent the defendant in the matter now in controversy before the judge and the judge professed to have no recollection of the defendant in the earlier case. Similarly here, the prior cases were unrelated to the instant matter and there was a long lapse of time between the trial court's representation of appellant and the instant trial such that neither remember the prior representations well. As such, our reading of the pertinent portion of the transcript does not reflect any bias or prejudice on the part of the trial court against appellant.

{¶94} In any event, we note that even if a disqualification of the trial court is warranted due to bias or prejudice, an appellate court is without authority to pass on issues of disqualification or to void a judgment on the ground that a judge should be disqualified. *State v. Donald*, 7th Dist. Mahoning No. 09 MA 172, 2011-Ohio-3400, citing *Beer v. Griffith*, 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775 (1978). When claiming bias or prejudice on the part of the trial court, a defendant's remedy is to file an affidavit of disqualification for prejudice with the

> clerk of the Supreme Court pursuant to R.C.
> 2701.03. *State v. Hussein*, 10th Dist. Franklin No.
> 15AP-1093, 2017-Ohio-5519, ¶ 9. The fifth
> assignment of error lacks merit.

*Sims*, 2021 WL 1423218, at *15–16.

Despite Sims's assertion that the trial judge "had personal knowledge of
alleged prior acts which would not otherwise have been properly before the
court," Doc. 1-2, at 16, Sims hasn't shown that the Ohio court of appeal's
finding that the trial judge didn't remember much about Sims's other cases
was unreasonable. The transcript supports the Ohio court of appeals' version
of events:

> Court: The Court had previously been assigned to
> represent Mr. Sims …. We were never in trial
> together. A notice of appearance was filed March 5th
> of 2007 by Mr. Robey. I was originally assigned 9-26
> of 2006, so I had the case a couple months. I believe
> there were some companion cases. That was very
> possible. This is from 12 years ago. The Court does
> not believe that I have any conflict. No offense, Mr.
> Sims, but I don't remember what your case was
> about nor do I remember correctly.
>
> ***
>
> Defendant: I had Greg Robey. I don't never seen you
> or anything. I don't remember ever seeing you
> period. I had Greg Robey.
>
> Defense counsel: Judge, not to disparage the Court
> in any way, but he indicates at that time Mr. Robey
> was his retained counsel. You may have been
> assigned 'til the arrangements finally came through
> with Mr. Robey to be retained. I asked him when we
> came into court if he recognized you and he didn't.
> So he doesn't remember that you gave him any

51

> advice one way or the other. He has no problems
> with you going forward handling this case.
>
> Court: I feel the same way.

Doc. 6-2, at 7–8. Sims argues that the trial judge "remember[ed] and comment[ed] on the feeling of having felt slighted by having been terminated by Sims," Doc. 1-2, at 16, because of this statement by the judge:

> I can tell you, Mr. Sims, I don't think that I have
> seen or heard from you in quite some time, and you
> were so pleased with my work you hired Greg Robey,
> who I think was your lawyer anyways, a couple
> months later. I don't know what happened with it
> after that.

Doc. 6-2 at 7. This passage doesn't show that the judge remembered Sims's case. It only shows that the judge had access to the public docket, which indicates that the judge was assigned to represent Sims and then Sims retained attorney Robey. *See, e.g., State v. Sims*, Cuyahoga County Court of Common Pleas, Case No. CR-06-488322-A. The judge's self-deprecating joke about Sims being pleased with the judge's past work as assigned counsel doesn't "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *See Liteky*, 510 U.S. at 555.

Even if the trial judge had remembered something about Sims's other cases, which Sims hasn't shown, that would not show that the Ohio court of appeals' decision was an unreasonable application of Supreme Court precedent. *See Coley v. Bagley*, 706 F.3d 741, 751–52 (6th Cir. 2013) ("We have found no constitutionally actionable bias in capital cases just because the trial

judge knew of … bad facts [about the defendant], but did not recuse herself ….
We presume the judge to have followed the Ohio state law which forbids
considering nonstatutory aggravators while weighing aggravation against
mitigation, to have known that law, and to have applied it in making her
decision"). Indeed, under the federal statute that *Liteky* interpreted, "judges
are not automatically required to recuse themselves in cases involving their
former clients." *Armenian Assembly of Am., Inc. v. Cafesjian*, 783 F. Supp. 2d
78, 90 (D.D.C. 2011) (citing 28 U.S.C. § 455(b)(2)), *aff'd*, 758 F.3d 265 (D.C. Cir.
2014).

Sims complains that he wasn't "offered time to reflect on the past
representation." Doc. 9, at 17. But Sims said that he didn't recognize or
remember the judge at all; spoke to counsel before the judge addressed the
court; and heard the judge's recitation of the procedural history of the other
cases. *See* Doc. 6-2, at 8. Sims doesn't explain what was improper about this or
cite Supreme Court precedent indicating a per se rule about the amount of time
a defendant should be given for reflection in this situation.

Finally, Sims argues that the Ohio court of appeals' decision was
contrary to Supreme Court precedent because it found that Sims's remedy was
to "file [under Ohio law] an affidavit of disqualification for prejudice with the
clerk of the Supreme Court." Doc. 9, at 18; *Sims*, 2021 WL 1423218, at *16. But
Sims argued Ohio law to the Ohio court of appeals, Doc. 6-1, at 129–32, so it
isn't surprising—or unconstitutional—for the Ohio court of appeals to rely on

Ohio law when it ruled on Sims's claim. Moreover, the Ohio court of appeals' discussion of an appropriate remedy under Ohio law was an alternative finding—the court had already concluded that Sims had not shown "any bias or prejudice on the part of the trial court against appellant." *Sims*, 2021 WL 1423218, at *16; *see Liteky*, 510 U.S. at 555–56. Sims doesn't allege that this conclusion was contrary to Supreme Court precedent. *See* Doc. 1-2, at 17; Doc. 9, at 19. Ground four is procedurally defaulted and fails on the merits.

     *Ground six fails on the merits*

     In ground six, Sims argues that the Ohio court of appeals unreasonably applied a harmless error analysis. Doc. 1-2, at 21. It is not clear what Sims is alleging. He objects to the Ohio court of appeals' evaluation of different claims in which, he alleges, it "repeatedly failed to determine whether the claims before it constituted error, but would imply, suggest, or assume they were error then fail to offer a correct harmless error analysis." *Id*. at 23. To the extent Sims argues that a court may not assume error before conducting a harmless error analysis, such a claim fails because Sims hasn't shown that Supreme Court precedent compels such an approach. *Cf., Rose v. Clark*, 478 U.S. 570, 576, n.5 (1986) (assuming without deciding that jury instructions were improper and evaluating whether the assumed error was harmless); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 413 (6th Cir. 2009) (assuming without deciding that the state court erred and evaluating that assumed error for harmlessness under *Brecht*).

Next, Sims ignores the pertinent harmless error standard that this Court applies when evaluating a state court's harmless error determination. Doc. 1-2, at 21–26; Doc. 9, at 21. The standards, as *Davis v. Ayala*, 576 U.S. 257, 267–68 (2015), explained, are as follows:

> The test for whether a federal constitutional error was harmless depends on the procedural posture of the case. On direct appeal, the harmlessness standard is the one prescribed in *Chapman* [*v. California*], 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 [(1967)]: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.*, at 24, 87 S.Ct. 824.
>
> In a collateral proceeding, the test is different. For reasons of finality, comity, and federalism, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht* [*v. Abrahamson*], 507 U.S. [619] at 637, 113 S.Ct. 1710 [(1993)] (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). There must be more than a "reasonable possibility" that the error was harmful. *Brecht*, *supra*, at 637, 113 S.Ct. 1710 (internal quotation marks omitted). The *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (per curiam).

*Id.* In order to obtain habeas relief, Sims must satisfy both the *Brecht* "substantial and injurious effect or influence" test *and* the AEDPA "contrary to or unreasonable application" test. *See Brown v. Davenport*, 596 U.S. 118, 134 (2022). Put simply, "where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court itself harbors grave doubt about the petitioner's verdict." *Id.* at 136.

Sims hasn't shown that the portions of the Ohio court of appeals' decision that he challenges satisfies either the *Brecht* or AEDPA tests. To start, he only block quotes various passages from the Ohio court of appeals' decision and alleges, without explanation, that the court "fail[ed] to offer a correct harmless error analysis." Doc. 1-2, at 23–25. The Court isn't required to "conjure allegations on a litigant's behalf" even when evaluating a pro se petitioner's claim, *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), and here Sims is represented by counsel. Sims concludes that "[e]ssentially, the reviewing state court applied a standard that appellant was not prejudiced if any other evidence existed. This standard is erroneous." Doc. 1-2, at 25. But the Ohio court of appeals didn't look at whether *any* other evidence existed; it looked at the strength of the evidence against Sims, which it found overwhelming. *Sims*, 2021 WL 1423218, at *9–10, 12–13. Sims hasn't shown that he is entitled to relief on his harmless error claim, so ground six fails on the merits.

56

**Conclusion**

For the reasons set forth above, I recommend that Sims's Petition be denied.

Dated: May 1, 2024

                              */s/ James E. Grimes Jr.*
                              James E. Grimes Jr.
                              U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).